The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. The first case for argument this morning is 19-1513, Pfizer v. Chugai Pharmaceuticals. We're ready to proceed, Counsel, when you are. Good morning, Your Honors, and may it please the Court. This is an appeal from a decision of the Patent Trial and Appeal Board finding that Shadle, the only prior reference at issue below, did not meet the molarity limitation in the challenged claims. This Court should reverse the Board's construction of the term molarity and vacate the Board's decision which upheld the two patents challenged over the Shadle reference. I'd like to start first by addressing standing in the case and then I will turn to the merits. Thank you, Your Honor. Pfizer has standing in this case and to bring this appeal. Pfizer has suffered an injury in fact because there's a substantial risk that Chugai will bring an action for patent infringement for a product that Pfizer launched earlier this year. But you have to establish standing at the time you commenced the appeal. That is presumably when you filed a notice of appeal. And in reading your affidavit, I don't see that that issue is addressed. Thank you, Your Honor. Standing was self-evident at the time the appeal was initiated. The parties here are competitors. The Chugai, the petitioner, excuse me, the Chugai, the patent owner, had identified Genentech in its real party and interest statement both before this court and in the record below. Pfizer had a patent dispute with Genentech and its parent company, Roche, who also controls Chugai. At the time the appeal was initiated, that patent dispute was ongoing. And ultimately, subsequent to the initiation of the appeal, the patent dispute was settled and Chugai, neither Chugai nor the patents at issue here were included in the settlement. So at the time Pfizer initiated the appeal, Pfizer had no reason to believe that standing was not self-evident. Yeah, but what's missing, it seems to me, is any information about your plans as of January 30, 2019, when the notice of appeal was filed. There's information about a planned launch later in October, but I don't see anything addressing the situation as of January 30. Thank you, Your Honor. At that time, Pfizer had its BLA on file before the FDA, and all the parties in this appeal were aware of this fact. As I mentioned, Roche… Where is that in the record? It's self-evident from the record, Your Honor, because the product here is rituximab, and the product was identified in the petition, albeit in an email reflector. Chugai obviously knew that the product was involved here because Chugai, in the record below, identified Genentech as a real party in interest. So it was self-evident to the parties here that there was a product at issue in this case at the time of the appeal, Your Honor. As I mentioned, the product was the subject of a patent dispute between Genentech and Roche, which controls Chugai. As I also mentioned, Chugai identified Genentech as the real party in interest in the record below in the IPR at that appendix 1579. The product that was the subject of that dispute, the rituximab product, is made using protein-A chromatography, and that is the method for purifying protein that's described and cleaned in the patents at issue in this case. Pfizer settled with Genentech and Roche, and as I mentioned, neither Chugai nor the patents at issue here were included in that settlement, and Chugai is free to assert those patents even today. This injury, in fact, that is that there's a substantial risk that Chugai will bring an action for infringement, is further compounded by the estoppel provisions of 35 U.S.C. Section 315E. Those provisions could limit Pfizer's invalidity theories in subsequent actions, including the anticipated infringement action that Pfizer expects from Chugai. Turning to the merits of the case, unless the court has any other questions on standing, I'd like to turn to the merits of the case. On the merits, the board incorrectly found that the disclosure of an acidic 25-millimolar citrate solution in the Shadle reference, which is the only reference at issue below, the court found that that reference did not provide enough information to meet the claimed molarity limitations in these claims. And in making this finding, the board erroneously construed the molarity limitation in the claims. The board construed the molarity limitation as the overall molarity of the solution and not of any particular solute within the solution. The final written decision below also refers to this as the total solute or total molarity, and Pfizer's position is that the board's construction is inconsistent with the intrinsic evidence for several reasons. First, the specification nowhere describes or calculates the overall molarity for either the acidic aqueous solutions described in the specification or the neutralized eluate described in the specification. In addition, the prosecution history describes the molarity of acidic aqueous solutions in the prior art solely by reference to the components identified in those solutions, rather than by the total molarity construction that the board adopted. I know Fairgate is referring us to the intrinsic record of the specification of the prosecution history, but it seems to me that the plain language of the claims seems to refer to a concentration of the solution as a whole, not a single solute, and I think that's pretty persuasive in supporting the board's claim construction here. If you could address that, but also the fact that you had a shifting claim construction, right? You all have been changing your position on the correct claim construction during this proceeding. Am I correct about that as well? Well, to answer the questions in order, Your Honor, we think that the claim term, acidic aqueous solution, is focusing on the identified components, the molarity of the identified components that make the solution acidic. We think that the total molarity construction that the board has adopted is just unworkable because it requires knowledge of how the particular solution was prepared. As you can imagine, these solutions are prepared in different fashions, and they often contain unknowable, unidentified, unidentifiable solutes in the solution. It's a construction that, while the claim says solution, looking at the claim language alone and saying that you have to look at all known and unknown solutes in the solution is just an unworkable construction. Our position is supported by the fact that when you look at the specification of the patent, for example, when you look at the acidic aqueous solutions that the patent describes, it follows exactly the approach that Shadle found. The specification identifies the solutions by the molarity of aqueous component. Secondly, we did not shift constructions. By giving solute in our construction, we meant the identified solutes. Your Honor, I'd just like to take another minute or two into my rebuttal time, if that's okay, to just address the Shadle reference, if that's okay. That's to say that the Board erroneously found that the Shadle reference requires a determination of molarity. The Shadle reference requires a determination of how the reference was made, and that simply goes beyond the Board's construction and beyond the specification. Most importantly, Chugai in the European Patent Office characterized the Shadle reference and characterized the citrate solution of the Shadle reference as a 25 millimolar solution. Chugai itself in Europe did not use the Board's total molarity construction. I'll finish, Your Honor, and reserve the rest of the time for rebuttal. Let me ask you a quick question, and this goes to the anticipation question. It is correct, is it not, that at least until you got to your reply, you had not raised the inherency theory of anticipation relying on the disclosure in Shadle. Am I right about that? That's correct, Your Honor. Okay, well how can, and therefore the other side have an opportunity to respond. Isn't that problematic for you, for us to reach that issue on appeal? Your Honor, we believe the other side did have the opportunity to respond. The inherency evidence was, or the evidence underlying our reply was supplied before the deposition of our expert. The other side was able to depose that expert before its patent owner response. Well, isn't there a difference? Even assuming you're correct, in other words, that the evidence is the same, and I'm not 1,000% clear on that, but it's still up to you to make the argument. They don't, why are they, how are they unnoticed that you're making an inherency argument notwithstanding that the evidence that you're now using may have already been in the record? Your Honor, we made the argument in the reply as, you know, based on the evolving construction here, but at bottom, we believe that the evidence shows that the claim term is expressly met. So the inherency issue takes lesser priority in our view than the fact that Shadle expressly anticipates the claim under either our construction or the Board's construction. How did their expert affidavit addressing the inherency question get into the record? Thank you, Your Honor. Their expert responded to our arguments that we provided in the evidence before the patent. When did they submit their expert declaration on the subject of inherency? They submitted it with their patent owner response. So were they addressing the issue of inherency in the patent owner response? The patent owner response was addressing the calculations that our expert provided, which our expert provided to show that the claim was met even under the Board's total solute construction. So after the institution, Petitioner provided an expert updated calculations to show that even under the Board's construction, the claim terms would nevertheless be met. And Petitioner, excuse me, patent owner, its patent owner response came back with Dr. Kramer's declaration, which addressed those calculations and said that in addition to the four methods that our Petitioner's expert provided, there was an additional fifth method, which patent owner's expert said was purportedly available. And we disagree with that for the reasons we stated in the record, Your Honor. Okay. Good morning, Your Honor. May it please the Court. There are a couple of issues that have not been raised, and I'm happy to address the issues that were discussed. If the Court has questions on the other issues, I'm happy to address those as well. As to standing, there is no evidence sufficient to support Pfizer's assertion of injury in fact here, not at the beginning of the appeal and not now. Just a few corrections of the statements made by Mr. Scheibler. There is no showing here that Chugai and Pfizer are competitors, as we addressed in our papers. The identification of a real party in interest here and below was out of an abundance of caution. In Appendix 1579, we stated we didn't believe Genentech would actually be considered a real party in interest below. And here, as we indicated, we included them for purposes of screening case conflicts. In terms of – Well, what do we – I'm sorry to interrupt, but what do we make of that? I mean, you know, the other side kept talking about, using the phrase, it was self-evident. You can tell us now that we put in a real party of interest and we really didn't mean it. But if we're supposed to conclude that it was self-evident, don't we take it as a given that you identified them as a real party in interest in your case? Your Honor, we did identify them as a real party in interest. That is not sufficient to show that Pfizer had standing here. The parties to the dispute did not include Chugai. We did not receive an ABLA from Pfizer. We are addressing patents here that are not specific to rituximab, which is the product that Pfizer and Genentech had a dispute about. And Genentech is not licensed on these patents. So to suggest that simply because Pfizer included the word rituximab in the email service address in its petition and that as a result of that we identified Genentech because they sell rituximab in the United States, that that makes Pfizer's standing with injury in fact care self-evident, I think, is not supported by the record. As to the assertion regarding protein chromatography and that that being sufficient to assess standing now, the only evidence we have from Pfizer about supposed injury is that Pfizer says it has a process that involves use of protein-A chromatography. That's Appendix 6325, paragraph 10, and that the patents somehow relate to protein-A chromatography. The problem with this argument is that protein-A chromatography was well-known and widely used long before these patents. They say that they think there's a risk that they would get sued. They say may. I'm sorry, Your Honor. Yes. Judge, they say may. They may be sued, and they don't explain why. It's their burden to show that their actions are likely to cause a suit, not that someone may bring a suit. Anyone can assert may bring a suit, and that removes Article III as the floor that this court has confirmed it is. Well, what about you? I mean, should we tolerantly suggest to you that you represent whether or not you will bring the suit? Your Honor, I'm not aware of any concrete plans to bring a suit, but there's nothing in the record from Pfizer on this. And as the court has noted, they need to show standing for the entirety of these appeals. But you're not prepared to make a representation to the court at this point that no such suit will be brought. I take it from your answer. Judge Bryson, no, I'm not in a position to make that representation. But I think, again, that's the kind of thing that would remove Article III as the floor. If every appellee were asked, well, will you covenant not to sue standing here today, that could be asked by Consumer Watchdog, by Psygenics, and by all the appellants that have been found not to have standing here. Could you address the merits here, lest my colleagues have other questions about standing? We have a record here where if you make the product using four methods, the anticipatory product using four methods, there's anticipation but not under a fifth method. And their expert says that the four methods were the normal and usual way of doing it, and the fifth method was not. And I look at your expert declaration. I don't see that he really contradicts that. And then I look at the board decision, and when I read the board decision, I see them paying lip service to the normal and usual standards. But the language that they use really in places seems to suggest that a mere possibility or that it was reasonable to use a fifth method is sufficient to defeat anticipation. Could you address that? Yes, Judge Dyck. Thank you for asking. So, first, I think the language normal and usual is being brought in for a different purpose. I don't think it's actually the standard here. We're looking at available methods to a person of ordinary skill. Why isn't that the standard, you know, going all the way back to the Carnegie case in the Supreme Court? And we have King, and we have other cases which says that's the standard. That's not the standard? Your Honor, those cases are about what happens when you know, say, the input to a process. What is the normal and usual result of those inputs? What would they result in? And that is not the situation we have here. Here we are looking at, for example, the acidic aqueous solution. That's not the result of two things that are known, and all of a sudden you end up with the acidic aqueous solution. That's one of the inputs here. So, in King, for example, if you take two things together and you have proof that those happen, you get the result. But here, we don't have the input. There is no proof that Shadle actually met the molarity limitation for its acidic aqueous solution. So, there's no – that function of those cases is not about what would be known to a person of skill as available. It's an attempt to fill a gap in what is disclosed in Shadle. Well, let's suppose hypothetically that we were to conclude that the normal and usual standard does apply here. What's your response to the fact that their expert said that the FISH method was not a normal and usual method, that your expert didn't say that it was, and that the Board seems to have applied a different standard? Well, Your Honor, their testimony here, and it's on pages 21 and 22 of the appendix, shows that Dr. Kramer testified it was a well-known, readily available, and reasonable choice to a person of ordinary skill in the arts. And the Board credited that. That's not the same as normal and usual, is it? Your Honor, I'm not sure there's a meaningful difference there. The test is not what is the most popular choice. It's like saying because chocolate, strawberry, and vanilla are the most popular choices, that chocolate chip is not a reasonable choice, is not normal. That's really the analysis we're getting from Dr. Presbyshian and Pfizer. What the testimony here shows is that this was a readily available choice, and Dr. Kramer explained the reasons a person of ordinary skill would use this choice based on the reagents that were available, preferences, the level of experience, and so forth. He showed an example. I'm not sure that under the case that the fact that something is a reasonable or available choice makes it a normal and usual way of doing it. Your Honor, I'm not sure that, again, that the normal and usual language, which is to talk about what occurs when there's not explicit disclosure of the result, is actually the applicable test here. I know that the Board addressed that as well. The criticisms that Dr. Presbyshian made about the trisodium citrate option that Dr. Kramer testified about were expressly considered and rejected by the Board. So to his effort to show that it was somehow not normal to use trisodium citrate, the Board responded that it was indeed possible to do that. It was an available choice. A person could have used it. It would have been, as I said earlier, well-known, readily available, and a reasonable choice that could reasonably be elected by a person of skill. Two other quick points on this, Judge Dyke. First, Dr. Kramer, excuse me, Dr. Presbyshian did not testify that there were only five methods. In fact, he said in the record, this is Exhibit 2020 at page 157, that there are many methods of preparing the buffers. The evidence in the record shows that there were more than his four and Dr. Kramer's one. And what's happening here is it's their burden to show inherency. The counterexample that we've pointed out here simply shows the shortcomings in that, and that's what the Board concluded at page 29 of the appendix. So we win, for that matter, even if there are only four methods, using wash buffer 2.1 liters with Dr. Presbyshian's formula number one would yield a malarity that's outside the range at 2332 of the appendix. Judge Dyke, does that address your question? I think it addresses it. One other point in response to the comment earlier about the timing of expert declarations, we did not have an opportunity to submit an expert declaration after they put in their reply petition on inherency. And there's certainly no abuse of discretion that's been demonstrated here in the Board's decision to find the inherency argument to have been laid in improper. Unless there are further questions, I'm happy to turn my time back to the Court. Colleagues, thank you. Thank you, Your Honor. Time for rebuttal. How much time is remaining, Michael? Only 18 seconds, Your Honor. Oh, okay. Well, we'll restore several minutes on rebuttal. Mr. Scheibler? Thank you, Your Honor. I apologize. We agree that the Board's decision only paid lip service to the problems with Chugai's evidence concerning the fifth method espoused by Dr. Kramer. But more importantly, we think that the evidence below shows clearly here that there is a strong case for express anticipation by the Shadle reference. If the Court would look to pages 16 and 17 of the final written decision, what you'll see is that the final written decision required more from its own claim construction in analyzing the Shadle reference. Because it said, for Shadle to anticipate, one needs to determine how the buffer in Shadle was made. And that goes far beyond the claim construction, and it goes far beyond anything that's in the specification of the challenged patents here. The fact is that the challenged patents identify its aqueous acidic solutions to the same level of granularity as Shadle. I'll give you a quick example. Doesn't Shadle have to disclose what it is about its formula that gets you to under 100 millimoles? I don't see that Shadle contains enough information to make that determination setting just by itself. Thank you, Your Honor. By itself, there's nothing in Shadle to lead an artisan to doubt that it shows anything other than a 25 millimolar solution containing citrate and citrate only. And the interesting thing is that the evidence... But that depends, does it not, on the acceptance of your claim construction? We believe it does not, Your Honor, because the evidence below shows that our expert came with four methods to show how Shadle's buffer could be made. The conventional methods, and in fact showed that methods three and four were the most conventional methods used in the industry. And even Dr. Kramer, Chugai's expert, used those methods. Those methods, three and four, both use citric acid and form sodium citrate to create the buffer. But that seems like its inherency argument, not the express disclosure argument. Well, we believe it's expressed, Your Honor, because those two methods, that is methods three and four, which are the most conventional methods, yield exactly what Shadle says they yield, a 25 millimolar solution that contains all citrate. And this is only buttressed by the fact that even the other methods, the other two methods that Dr. Presbysian testified, yes, they show a molarity higher. But in both those cases, the molarity of the acidic aqueous solution was 30 and 44, still significantly below the molarity of the claim limitation. There's no evidence of record here to show that an acidic aqueous solution of Shadle was anything other than 25 millimolar. And at best, there's certainly no evidence to show that an artisan would make that buffer that could be made over 100 millimolar. So we think there's a strong case for express anticipation here because Shadle says it's a 25 millimolar solution and it's citrate, full stop. That's really how artisans would look at this. And Dr. Presbysian's evidence shows that. And if I could just say one word on standing here, Your Honor. You know, counsel said that Genentech is not licensed under these patents. That's a new fact that is not in the record below. And counsel, the court questioned counsel about the willingness to stipulate to infringement. And the court, I believe, will know that that kind of question has been asked to counsel in previous cases. For example, in the Altair case, that was asked of counsel at oral argument. Counsel refused, and Altair found standing. So that buttresses our position on standing. And these parts – excuse me. Just one more sentence because your time has expired. Okay. Thank you, Your Honor. I'll finish there. Thank you for your time. Did any of my colleagues have further questions? I'm sorry. No. Did I? No. Judge Bryson? No. Okay. We thank both parties, and the case is submitted. Thank you.